UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:21-cv-173-MOC-DCK

| | |
|---|---|
| TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA, | )<br>)<br>) |
| Plaintiff, | )<br>) |
| v. | )<br>)<br>) |
| JELD-WEN HOLDING, INC.; et al., | )<br>) |
| Defendants. | )<br>) |
| JELD-WEN HOLDING, INC., | )<br>)<br>) |
| Third-Party Plaintiff, | ) |
| v. | )<br>)<br>) |
| OLD REPUBLIC INSURANCE COMPANY, | )<br>)<br>) |
| Third-Party Defendant. | )<br>) |

**ORDER**

**THIS MATTER** is before the Court on the parties' opposing Motions for Summary Judgment. (Doc. Nos. 46, 58). JELD-WEN Holding, Inc. ("Jeld-Wen") seeks coverage under a directors and officers ("D&O") liability insurance policy issued by Travelers Casualty and Surety Company of America ("Travelers"). The Court held a hearing on the motions on September 22, 2022. For the following reasons, Jeld-Wen's motion is **DENIED** and Travelers' motion is **GRANTED**.

**I.     BACKGROUND**

1

### a. Antitrust Lawsuits

Jeld-Wen–among other things–manufactures and sells interior molded doors and "doorskins," a key component of interior molded doors. Interior molded doors are the most popular type of interior door in North America. (Doc. No. 1 at ¶ 3). In 2012, Jeld-Wen acquired CraftMaster Manufacturing, Inc. ("CraftMaster"), one of only two competitors in the doorskin market. Following this acquisition, Jeld-Wen and some of its directors and officers became embroiled in several antitrust suits.

In 2016, Steves and Sons, Inc. ("Steves"), one of Jeld-Wen's customers, filed suit challenging Jeld-Wen's 2012 acquisition of CraftMaster, as violative of antitrust laws. See Steves and Sons, Inc. v. Jeld-Wen, Inc., No. 3:16-cv-545-REP (E.D. Va.). Steves alleged that both Jeld-Wen and CraftMaster manufactured and sold interior molded doorskins, and that through the merger, Jeld-Wen utilized its new market power to coordinate with Masonite Corporation, its only remaining doorskin competitor. (Doc. No. 57-2 at ¶ 2). Steves alleged that Jeld-Wen's anticompetitive conduct raised doorskin prices above competitive levels and reduced the quality and output of doorskins below market competitive levels. (Id. at ¶ 2). In 2018, a jury found in Steves' favor and Jeld-Wen was ordered to rewind their merger with CraftMaster. See (Doc. No. 57-3 at ¶ 4; Doc. No. 57-2 at ¶ 3). On appeal, the Fourth Circuit affirmed the district court's decision ordering Jeld-Wen to divest CraftMaster. See Steves & Sons, Inc. v. Jeld-Wen, Inc., 988 F.3d 690, 699 (4th Cir. 2021).

In 2018, a number of Jeld-Wen and Masonite's direct purchasers between October 24, 2012, and April 10, 2019, brought an antitrust class action against Jeld-Wen. In Re: Interior Molded Doors Antitrust Action, No. 3:18cv718-JAG (E.D. Va.). The direct purchaser antitrust

class action alleged that Jeld-Wen and Masonite engaged in a conspiracy to fix interior molded doors prices, after Jeld-Wen acquired CraftMaster. (Doc. No. 57-4 at ¶ 83).

In 2019, Jeld-Wen was named in an additional antitrust class action initiated by people who indirectly purchased interior molded doors and doorskins manufactured by Jeld-Wen. In re: Interior Molded Doors Indirect Purchaser Litigation, No. 3:18-cv-00850JAG (E.D. Va.). The allegations in this matter mirrored those in the direct purchasers' antitrust class action. Compare id. ¶¶ 1–28, 60–112 with In Re: Interior Molded Doors Antitrust Action, No. 3:18cv718-JAG (E.D. Va.).

Also in 2019, Jeld-Wen notified its insurers at the time–insurers in the 2018-2019 tower described below–of the antitrust class actions. See (Doc. No. 57-8 at ¶ 9; see also Doc. No. 57-14 at ¶ 15).

In June 2021, the court approved Jeld-Wen's settlement of the direct purchaser antitrust action. See Final Approval Order and J. (Doc. No. 57-5 at ¶ 6). In July 2021, the court approved Jeld-Wen's settlement of the indirect purchaser antitrust class action. See Final J. Approving Settlement Agreement (Doc. No. 57-7 at ¶ 8).

### b. Securities Class Action Lawsuit

In 2020, Jeld-Wen, and several of its directors and officers, were sued in a securities class action lawsuit. See In re: Jeld-Wen Holding, Inc. Securities Litigation, No. 3:20-cv-112-JAG (E.D. Va.) ("Securities Class Action"). The class action alleged that from January 26, 2017, through October 15, 2018, the defendants made misrepresentations and omissions about the sources of Jeld-Wen's business success and the competitive marketplace for interior molded doors. (Doc. No. 21, ¶¶ 4, 38). In February 2020, Jeld-Wen simultaneously notified insurers in

the 2018-2019 and 2019-2020 towers of the Securities Class Action. See (Doc. No. 57-12 at ¶ 13).

The Securities Class Action was predicated upon Jeld-Wen's antitrust violations. The pleading states that the class action arose "out of Defendants' consistent misrepresentations and omissions intended to mislead the investing public by falsely attributing the source of [Jeld-Wen's] financial success to legitimate and lawful pricing strategies", when, in actuality, Jeld Wen "engaged in anticompetitive conduct in violation of federal antitrust laws which was artificially propping up [Jeld-Wen's] sales and was actually the true cause of Jeld-Wen's success." (Doc. No. 57-16 at ¶ 17). In other words, Jeld-Wen engaged in unlawful anticompetitive conduct and then lied about its unlawful conduct to its shareholders, leading the shareholders to file suit.

On April 20, 2021, Jeld-Wen agreed to settle the Securities Class Action and pay $39.5 million to the shareholder class (the "Securities Settlement"). (Doc No. 48 at ¶¶ 10–11). The funds for the settlement were to be (and have now apparently been) paid into an escrow account for distribution. (Id.).

### c. Directors and Officers Liability Insurance Coverage

To protect itself against securities-related claims and to protect its directors and officers from all manner of claims (including claims for which it must indemnify its directors and officers), Jeld-Wen had purchased directors and officers ("D&O") liability insurance coverage. (Id. at ¶ 2). Jeld-Wen bought a primary insurance policy and purchased underlying excess policies. The primary and excess insurance policies covering the period of March 15, 2018, to March 15, 2019 ("2018–2019 tower") is structured as follows: Arch Insurance Company ("Arch") issued to Jeld-Wen a primary D&O policy; National Fire Union Insurance Company of

4

Pittsburgh, Pa. ("AIG") issued an excess D&O policy providing a 2nd layer of coverage; XL Specialty Insurance Company ("XL") issued excess insurance as a 3rd layer of coverage; and Starr Indemnity and Liability Company ("Starr") issued excess insurance as a 4th layer of coverage. Each insurer provides $10 million in coverage per layer. Finally, in the 2018-2019 tower, Old Republic Insurance Company ("Old Republic") issued excess insurance as a 5th layer of coverage to Jeld-Wen.

The primary and excess insurance policies covering the period of March 15, 2019, to March 15, 2020 ("2019–2020 tower"), is structured the same as the 2018-2019 tower, except that the fifth layer of coverage (i.e. the fourth excess carrier) is Travelers rather than Old Republic.

The Travelers excess policy follows the form of the Arch primary policy and "incorporates by reference, and affords coverage in accordance with and subject to, the insuring clauses, warranties, definitions, terms, conditions, exclusions and other provisions contained in the [primary policy], except as regards the premium, the limit of liability, the policy period, and except as otherwise provided" in the Travelers excess policy. See (Travelers Excess Policy, Items 4 & 5(C)). Relevant here, the Travelers excess policy provides two coverage exclusions.

### i. Preceding Claims Exclusion

First, there is a preceding claims exclusion. Travelers' excess policy provides that the policy only affords coverage for Claims, Securities Claims, and Derivative Suits against Jeld-Wen "first made . . . during the Policy Period." (Doc. No. 1-4 at 8). Therefore, no coverage is provided "for any Claim made, or deemed first made, before the Policy Period."

Regarding related Claims, the policy stipulates that all Claims for (i) the same Wrongful Act, (ii) any Interrelated Wrongful Acts, or (iii) the same or related facts, circumstances, or situations shall be treated as a single Claim first made on the earliest date that (a) any of such

5

Claims commenced, even if that date is before the Policy Period, or (b) notice of any such Wrongful Act, Interrelated Wrongful Act, or fact, circumstance, or situation was given under any prior management liability or similar insurance policy. (Doc. No. 1-4 at 8).

"Interrelated Wrongful Acts" are defined as "[w]rongful Acts that have as a common nexus any fact, circumstance, situation, event, transaction, cause or series of causally connected facts, circumstances, situations, events, transactions or causes." (Doc. No. 1-4 at 12).

### ii. Prior Notice Exclusion

Second, the Travelers excess policy includes a prior notice exclusion. The prior notice exclusion states that there is no coverage for a loss–including defense costs–in connection with "any Claim for, based upon, arising from, or in any way related to any fact, circumstance or situation that, before the inception date of this Policy, was the subject of any notice given under any other directors and officers, management, employment practices or similar liability policy." (Doc. No. 1-4 at 17).

### d. Jeld-Wen's Dispute with Travelers

Jeld-Wen seeks coverage from its 2019–2020 tower insurers for the Securities Settlement. The four carriers beneath Travelers accepted coverage for the class action and agreed to fund the Securities Settlement, but "Travelers refused to pay." (Doc. No. 47 at 2). Specifically, Jeld-Wen asserts that the underlying limits for the Travelers policy have been, or soon will be, paid, so Travelers is obligated to pay $10 million in accordance with the 2019–2020 tower. (Id.).

Travelers responds that the action is not covered under the 2019–2020 Tower, contradicting the coverage positions of the insurers under the primary and excess policies below Travelers. (Doc. No. 56 at 18). Specifically, Travelers cites the preceding claim exclusion and asserts that Jeld-Wen's Securities Settlement claim and its policy preceding antitrust claims are

6

for interrelated wrongful acts. (Id. at 19). Because the securities lawsuit and the antitrust lawsuits are treated as a single claim, and the antitrust lawsuits predate the 2019-2020 period, the single claim for securities and antitrust lawsuits is deemed to be a Claim first made before the 2019-2020 policy period and is excluded from coverage. For similar reasons, Travelers argues that the prior notice exclusion also bars coverage for the securities lawsuit. According to Travelers, the securities claim and the antitrust claims arise from the same facts and circumstances. Therefore, because Jeld-Wen notified the 2018-2019 tower of these facts and circumstances before the inception of the 2019-2020 policy, the securities claim losses are not covered by the 2019-2020 policy. (Id. at 31).

Travelers has filed suit for a declaration of no coverage under the 2019–2020 tower, and Jeld-Wen has filed counterclaims against Travelers to confirm coverage under the 2019–2020 tower.

## II. LEGAL STANDARD

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). When determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities against the movant and in favor of the non-moving party. United States v. Diebold, Inc., 369 U.S. 654, 655 (1962).

The party seeking summary judgment has the initial burden of demonstrating that there is no genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the movant has made this threshold demonstration, the non-moving party, to survive the motion for

7

summary judgment, may not rest on the allegations averred in his pleadings. Id. at 324. Rather, the non-moving party must demonstrate specific, material facts exist that give rise to a genuine issue. Id. Under this standard, the existence of a mere scintilla of evidence in support of the non-movant's position is insufficient to withstand the summary judgment motion. Anderson, 477 U.S. at 252. Likewise, conclusory allegations or denials, without more, are insufficient to preclude granting the summary judgment motion. Dash v. Mayweather, 731 F.3d 303, 311 (4th Cir. 2013). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Anderson, 477 U.S. at 248.

This court has subject-matter jurisdiction based on diversity. Therefore, the court applies state substantive law and federal procedural rules. See Erie R.R. v. Tompkins, 304 U.S. 64, 78–80 (1938); Dixon v. Edwards, 290 F.3d 699, 710 (4th Cir. 2002). The parties agree that North Carolina law applies to consider the parties' state-law claims and defenses. Therefore, the court applies North Carolina law, and this Court must determine how the Supreme Court of North Carolina would rule. See, e.g., Twin City Fire Ins. Co. v. Ben Arnold-Sunbelt Beverage Co. of S.C., 433 F.3d 365, 369 (4th Cir. 2005). "If the Supreme Court of [North Carolina] has spoken neither directly nor indirectly on the particular issue before us, [this court is] called upon to predict how that court would rule if presented with the issue." Id. (quotation omitted).

### III. DISCUSSION

The central issue underlying both Jeld-Wen's and Travelers' motions for summary judgment is whether–under the Travelers excess policy–the preceding claim or prior notice exclusions applies to the securities claim. If so, then Travelers is under no obligation to provide coverage to Jeld-Wen. If not, then Travelers must provide coverage.

8

### a. North Carolina Law Governs the Insurance Policy's Interpretation

The Court interprets the insurance policy's language to resolve this issue. Gaston Cnty. Dyeing Mach. Co. v. Northfield Ins. Co., 351 N.C. 293, 299, 524 S.E.2d 558, 563 (2000) (quoting Fidelity Bankers Life Ins. Co. v. Dortch, 318 N.C. 378, 380, 348 S.E.2d 794, 796 (1986) ("[A]n insurance policy is a contract and its provisions govern the rights and duties of the parties…")). Interpretation and application of an insurance policy is governed by state law. Fed. Ins. Co. v. S. Lithoplate, Inc., 7 F. Supp. 3d 579, 584 (E.D.N.C. 2014). North Carolina law governs here. Under North Carolina law, "[w]here a policy defines a term, that definition is to be used. If no definition is given, non-technical words are to be given their meaning in ordinary speech, unless the context clearly indicates another meaning was intended." See Gaston Cnty. Dyeing Mach. Co., 351 N.C. at 299. When the language of the policy is ambiguous, courts must resolve the ambiguity in favor of coverage. Hunter v. Town of Mocksville, North Carolina, 897 F.3d 538, 548 (4th Cir. 2018); See also Wachovia Bank & Trust Co. v. Westchester Fire Ins. Co., 276 N.C. 348, 172 S.E.2d 518, 522 (1970) (holding that if there is more than one common meaning for a term, and the context does not clarify the intended meaning, the court should apply "the meaning most favorable to the policyholder").

### b. The Securities Claim Falls within the Unambiguous Preceding Claims Exclusion

The policy's preceding claims exclusion provides: "All Claims . . . for the same Wrongful Act, any Interrelated Wrongful Acts, or the same or related facts, circumstances, or situations shall be deemed to be a single Claim first made on the earliest date that: 1. any of such Claims was commenced, even if such date is before the Policy Period; 2. proper notice of such Wrongful Act or any Interrelated Wrongful Act was given to the Insurer pursuant to Section

9

11.B; or 3. notice of any such Wrongful Act, Interrelated Wrongful Act, or fact, circumstance or situation was given under any prior directors and officers, management, employment practices or similar liability insurance policy." (Doc. No. 1-4 at 8). Therefore, the policy excludes coverage when the current and preceding claims are: (1) for the same wrongful act; (2) for interrelated wrongful acts; or (3) for related facts, circumstances, or situations.

Jeld-Wen has asked the Court to take one of three paths: (1) the Court could find the antitrust and securities claims are separate claims based on completely different factual elements that cannot be characterized as claims based upon "interrelated" or "related" wrongful acts; (2) the Court could find that the language of the preceding claim and prior notice exclusions is ambiguous as written or as applied to the facts of this case and, using contract interpretation prescribed by North Carolina law, construe the language against Travelers and in favor of coverage for Jeld-Wen; or (3) the Court could find—based on a multifactor test employed by other courts—that claims involving different plaintiffs, different defendants, different conduct, different time periods, different resulting injuries, and different remedial schemes cannot and should not be bound together. See (Doc. No. 78). Alternatively, Travelers asserts that the policy language is unambiguous, the antitrust and securities claims fall within the clear meaning of "interrelated wrongful acts," and Travelers is not obligated to cover the Securities Settlement. After careful consideration of the policy's language and the common meaning of its words, this Court finds the preceding claims exclusion to be unambiguous. Moreover, this exclusion applies to Jeld-Wen's securities claim.

Whether a policy is ambiguous is a question of law. McCuen v. American Cas. Co., 946 F.2d 1401, 1408 (8th Cir. 1991). Under North Carolina law, "ambiguous provisions will be construed against the insurer and in favor of the insured." State Capital Ins. Co. v. Nationwide

Mut. Ins. Co., 318 N.C. 534, 350 S.E.2d 66, 68 (1986). But, before this rule of construction applies, the court must find a term to actually be ambiguous. An ambiguity only exists if "the language of the policy is fairly and reasonably susceptible to either of the constructions for which the parties contend." Wachovia, 172 S.E.2d at 522. Ambiguity is not automatically established, "simply because a plaintiff makes a claim based on a construction of the insurance policy's language contrary to that of the company's interpretation." Christ Lutheran Church by & Through Matthews v. State Farm Fire & Cas. Co., 122 N.C. App. 614, 471 S.E.2d 124, 125 (1996). Rather, "a term should be found unambiguous if the facts of the case 'comfortably fit within the commonly accepted definition of the concept,' but may be ambiguous if the facts fall on the margins of a broad reading." Highwoods Props., Inc. v. Exec. Risk Indem., Inc., 407 F.3d 917, 924 (8th Cir. 2005) (quoting Gregory v. Home Ins. Co., 876 F.2d 602, 606 (7th Cir. 1989)); See also Stewart Eng'g, Inc. v. Cont'l Cas. Co., No. 5:15-CV-377-D, 2018 WL 1403612, at *4 (E.D.N.C. Mar. 20, 2018), aff'd, 751 F. App'x 392 (4th Cir. 2018).

The facts here present two claims that comfortably fit within the common definitions of claims for "interrelated wrongful acts" and claims with "related facts, circumstances, or situations" as provided by the policy. Highwoods Props., Inc., 407 F.3d at 923 ("the same language may be found both ambiguous and unambiguous as applied to different facts."). Therefore, the preceding claims exclusion is unambiguous when applied to facts of this dispute.

The term "interrelated wrongful acts" is unambiguous because the policy provides a clear definition for the term. The policy broadly defines "interrelated wrongful acts" as acts "that have as a common nexus any fact, circumstance, situation, event, transaction, cause or series of causally connected facts, circumstances, situations, events, transactions or causes." (Doc. No. 1-4 at 12). Here, the facts create a common nexus sufficient to make the antitrust and securities

11

claims brought against Jeld-Wen interrelated under the policy's broad definition of "interrelated wrongful acts." First, the two claims involve a common scheme. Jeld-Wen aimed to hide its conspiracy with Masonite Corporation. Crucial to this aim was deceiving not only its customers, but also its shareholders. Indeed, as evidenced in the securities claim's pleading, it was Jeld-Wen's misrepresentations regarding their antitrust violations which prompted the securities suit. (Doc No. 57-16 at ¶ 17). Second, the two claims shared a common cast of characters. The same officers who engaged in antitrust violations also misrepresented Jeld-Wen's corporate success to its shareholders. And third, although the conduct in each claim is different, Jeld-Wen hid the same illicit conduct from both its customers and its shareholders, which served as a factual predicate for both claims.

Based upon these facts, this Court concludes that two claims which allege the same scheme, involving the same actors, who are hiding the same conduct are two claims that comfortably fall within the commonly accepted definition of a factual nexus, rather than on the outskirts of a broad understanding of the concept.

Case law supports this determination. In Hunter, the Fourth Circuit Court of Appeals found the term "interrelated wrongful acts" ambiguous because it lacked any accompanying definition and the policy itself had "chosen to provide the term 'related' with the definition commonly reserved for 'interrelated' while leaving 'interrelated' undefined." Hunter v. Town of Mocksville, N. Carolina, 897 F.3d 538, 552 (4th Cir. 2018). Here, to the contrary, a definition has been provided, and it was even a definition that the court in Hunter recognized as "the most common contractual definition of 'interrelated wrongful acts.'" Hunter, 897 F.3d at 551.

When similar definitions have been applied to the term "interrelated wrongful acts," a shared scheme, shared cast of characters, and shared misrepresentations have often been

12

recognized as factors establishing a common factual nexus. In W.C. & A.N. Miller Dev. Co. v. Cont'l Cas. Co., the Fourth Circuit examined a nearly identical definition of "Interrelated Wrongful acts" in an insurance policy and determined that two claims shared a "common nexus of fact." 814 F.3d 171, 175 (4th Cir. 2016). The court identified a common scheme involving common individuals as key characteristics that linked the two claims. Id. And in Stewart Engineering, the court found that distribution of the same faulty designs to two bridge projects by the same architectural firm were bound by a common factual nexus. Stewart Eng'g, Inc. v. Cont'l Cas. Co., No. 5:15-CV-377-D, 2018 WL 1403612, at *6 (E.D.N.C. Mar. 20, 2018), aff'd, 751 F. App'x 392 (4th Cir. 2018) ("Wrongful acts are logically connected if there are shared facts, circumstances, and decisions."). Although there may have been some "different actors and decisions involved in the design and construction of Bridge 1 and Bridge 2, such differences [did] not defeat a finding of relatedness." Id. In Stewart, the same design flaws were distributed to the two claimants. Similarly, here, the same misrepresentations were made to antitrust and securities claimants.

Likewise, the term "related facts, circumstances, or situations" is unambiguous. The term "related" has a common and clear meaning that "covers a very broad range of connections, both causal and logical," Highwoods Props., Inc., 407 F.3d at 924. In Highwoods, the Eighth Circuit–applying North Carolina law–determined that two securities claims were "related" because they "buil[t] on one another" and resulted in the accomplishment of a common goal, even though the two claims were brought by different plaintiffs and the second-filed claim included factual allegations that arose after the first claim was filed. Id. at 92. Similarly, here, the antitrust and securities claims are related because they build on one another and resulted in the accomplishment of a common goal.

13

Lastly, the decision by other insurers not to challenge the 2019-2020 tower's coverage of the Securities Settlement does not give credibility to a different determination. The 2019-2020 tower's primary insurer and the excess insurers beneath Travelers do not challenge coverage. Jeld-Wen suggests this demonstrates that Traveler's refusal to accept coverage is erroneous. (Doc. No. 47 at 2). However, the same primary insurer and excess insurers beneath Travelers in the 2019-2020 tower–Arch, AIG, XL, and Starr–comprise the primary insurer and excess insurers beneath Old Republic in the 2018-2019 tower. Therefore, regardless of whether the 2018-2019 tower or the 2019-2020 tower is responsible for coverage of the Securities Settlement, the same primary insurer and subordinate excess insurers have the same coverage obligation regarding the Securities Settlement. Indeed, the primary insurer or excess insurers beneath Travelers have no incentive to argue that either the 2018-2019 tower or the 2019-2020 tower bears the burden of coverage for the Securities Settlement, it would only be a waste of their time and money. Therefore, the primary insurer and subordinate excess insurer's acceptance of coverage does not lend weight to Jeld-Wen's interpretation of coverage.

In sum, applying the language of the Travelers excess policy to the facts of this case, this Court concludes that an antitrust claim and a securities claim are for interrelated wrongful acts—and share related facts, circumstances, or situations—when they allege the same scheme, involving the same actors, who are hiding the same conduct. Therefore, the preceding claim exclusion applies, and the antitrust and securities actions are "deemed to be a single Claim" first made when the antitrust actions commenced. Because the antitrust actions commenced before the 2019-2020 policy period began, both the antitrust claims and securities claims fall outside the scope of the Travelers excess policy's coverage. Because this Court finds that the preceding

14

claims exclusion applies, there is no need to address the applicability of the prior notice exclusion.

## IV. CONCLUSION

Jeld Wen's motion for summary judgment is denied and Travelers' motion for summary judgment is granted for the reasons stated herein.

**IT IS, THEREFORE, ORDERED** that:

(1) The Motion for Summary Judgment filed by Jeld-Wen (Doc. No. 46) is **DENIED**.

(2) The Motion for Summary Judgment filed by Travelers (Doc. No. 58) is **GRANTED**.

Signed: November 18, 2022

Max O. Cogburn Jr.
United States District Judge